United States District Court
Southern District of Texas
**ENTERED**
December 12, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| KELLY CHINEDU UFELI, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:19-CV-00106 |
| | § | |
| TEXAS A & M UNIVERSITY SYSTEM, | § | |
| *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Kelly Chinedu Ufeli filed this civil rights suit against Defendants Texas A&M University System ("TAMUS") and Texas A&M University-Corpus Christi ("TAMUCC"). Ufeli, a former student, alleges that Defendants discriminated against him on the basis of race and disability, ultimately dismissing him from the school and refusing to confer a degree despite Ufeli's satisfactory academic performance. (D.E. 24). Defendants have filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and Ufeli has responded. (D.E. 27, 30). For the reasons discussed further below, it is recommended that Defendants' motion to dismiss be GRANTED and Ufeli's first amended complaint be DISMISSED.

**II.   BACKGROUND**

    **a.   Complaint and Claims**

In the first amended complaint, Ufeli alleges that he is a black male who was born in Nigeria and, after emigrating to Canada, enrolled at Texas A&M-San Antonio. (D.E. 24 at 3-4). However, because Texas A&M-San Antonio did not have a nationally

recognized program in his area of study, he transferred to TAMUCC. (*Id.* at 4). Ufeli alleges that he was discriminated against on the basis of race and nationality when: (1) Defendants refused to provide him with the proper I-20 immigration paperwork for 18 months; (2) Dr. Michelle Hollenbaugh ejected him from a class for asking a pertinent question; (3) Hollenbaugh unfairly graded his assignments, ultimately issuing him a D grade; (4) Defendants terminated his I-20 on March 15, 2019; (5) Dr. Mavarene Oliver failed him in another class that he did not complete due to depression and despondency caused by Hollenbaugh's actions; (6) Oliver manipulated his grade in another class; and (7) Defendants delayed a ruling on his discrimination complaints until his I-20 was terminated, resulting in his dismissal from TAMUCC. (*Id.* at 4-9).

Further, Ufeli alleges that he was discriminated against under Section 504 of the Rehabilitation Act ("Section 504") and Title II of the Americans with Disabilities Act ("ADA") because he became "depressed, despondent, and emotionally incapacitated" as a result of Defendants' actions, but they ignored these disabilities and refused to provide accommodations. (*Id.* at 9).

Ufeli raises the following claims: (1) the Defendants violated his civil rights under 42 U.S.C. § 1983, for which he seeks reinstatement to TAMUCC and the accommodations he is entitled to; (2) the Defendants violated Section 504 by discriminating against him on the basis of his disabilities, for which he seeks damages and punitive damages; and (3) the Defendants violated the ADA by discriminating against him on the basis of his disabilities, for which he seeks damages and punitive damages. (*Id.* at 12-16).

    **b. Attached Evidence**

Ufeli attached the following evidence to his complaint that he contends supports his claims. (*See id.* at 9; D.E. 24-1 at 1-202).

TAMUCC policy prohibits discrimination on the basis of race, color, national origin, or disability, among other categories, and provides for a review process for discrimination complaints. (D.E. 24-1 at 2-6).

In a March 2017 e-mail, Ufeli indicated that he had completed the paperwork necessary to transfer to TAMUCC from another Texas A&M campus. (*Id.* at 7). In a May 2017 e-mail, Ufeli indicated that he had completed the paperwork necessary for reinstatement to F-1 immigration status. (*Id.* at 11-12).

In an October 2017 e-mail to Hollenbaugh, Ufeli stated that he intended to take her "Counseling Process" class during the spring 2018 semester and requested approval to register for the class. (*Id.* at 15-16). Hollenbaugh approved his registration for the class. (*Id.* at 36). Two weeks later, Hollenbaugh e-mailed Ufeli, inquiring whether he still planned to register for the class because there was a waitlist and he had, to that point, failed to register. (*Id.* at 40). Ufeli explained that his registration would be late because he was waiting for his tuition funds to arrive from Canada and his university account had a hold placed on it due to an outstanding balance for fall 2017. (*Id.* at 41, 45).

On January 3, 2018, Ufeli e-mailed Dr. Robert Smith, the department chair for the TAMUCC Department of Counseling and Educational Psychology, to schedule an appointment regarding his difficulty registering for the spring semester. (*Id.* at 46-47). On January 24, 2018, Hollenbaugh e-mailed Ufeli and stated that she was not expecting

3

him to be in her class the previous night. (*Id.* at 72). Hollenbaugh stated that she spoke with Smith and learned that Smith told Ufeli to speak to Hollenbaugh about the possibility of attending the class until he could register. However, Hollenbaugh stated that the class was now completely full and Ufeli would not be able to register for it that semester, but would be able to take it during the summer semester. (*Id.*).

In April 2018, Ufeli e-mailed Amy Aldridge Sanford, TAMUCC's Vice President of Academic Affairs, because he could not register for summer classes due to a hold on his account from admissions and the International Education Office. (*Id.* at 81-82). He requested help in getting the issue resolved. (*Id.*). In a subsequent e-mail, Ufeli stated that the issue was that his documentation with United States Citizenship and Immigration Services ("USCIS") was still pending because his F-1 immigration status was terminated when he transferred. (*Id.* at 85-86). Ufeli wanted to be reissued an I-20 form so that he could travel to Canada and then re-enter the United States with a stamped and valid I-20. (*Id.*).

Sanford responded that, after speaking with Derek Yu in the International Education Office, she understood that Ufeli had a complicated case and that Yu had advised him to consult with an immigration attorney because Ufeli's student status was not current with the government and it could be difficult to obtain F-1 status. (*Id.* at 107). Sanford also noted that Ufeli had filed an appeal for a green card petition and asked admissions for Texas residency, but that Yu was concerned that the denial of an F-1 visa could also result in the denial of the green card petition. Sanford indicated that they had requested help from TAMUS's legal team, but also advised that Ufeli speak with an

4

immigration attorney himself and provided him with locations and contact information for a nonprofit immigration organization. (*Id.*). Ufeli responded that he did not want to speak to an immigration lawyer, which would be "a waste of time," and instead wanted to take his chance by being issued an I-20 and attempting to re-enter from the Canadian border. (*Id.* at 111).

In a June 2018 e-mail, Hollenbaugh informed the students in her summer class that they would not be meeting on July 3, but that there was "an online module with assignments you will need to complete and submit." (*Id.* at 73-74). On July 11, Ufeli e-mailed Hollenbaugh because he was not given a grade for the assignments. (*Id.* at 74-75). Hollenbaugh responded that Ufeli had not submitted responses for the assignments, so he did not receive points. (*Id.* at 75). Ufeli indicated that he did not know that he was supposed to submit responses and thought he was just supposed to practice the skills. (*Id.* at 76). Hollenbaugh noted that there were extra credit points available if he was worried about his grade. (*Id.*).

Ufeli subsequently lodged a discrimination complaint with TAMUCC's Employee Development and Compliance Services Office ("Compliance Office") alleging that Hollenbaugh discriminated against him on the basis of race. (*Id.* at 117-19). Ufeli identified several instances of discrimination, including that Hollenbaugh: (1) always asked him to repeat his questions and stated that she did not understand his questions; (2) did not give him a grade for the three online assignments and did not allow him to turn them in late, even though she allowed some classmates to turn in their transcription papers over a week late; (3) singled him out for criticism when evaluating in-class role

play sessions; (4) told him his lower grades for the role play sessions and related transcription papers were because he was not verbally reflecting feelings, but Ufeli believed the lower grades were because he was the only black student; (5) had the class discuss their career plans in small groups, which Ufeli believed was a ruse to get personal information about the students which, ultimately, led to his internship offer being revoked. (*Id.* at 118-19). Ufeli noted that the experience was emotionally destabilizing and caused him to not complete another course that he was taking at the same time. (*Id.* at 117).

The grade sheet from Hollenbaugh's course showed that Ufeli received no points on three assignments that were due on July 5, 2018, although he received points for two other assignments due that day. (*Id.* at 120).[1] Ufeli lost the bulk of his points on the three role play assignments, which accounted for 600 of the 736 total points available in the class. (*Id.*).

On October 22, 2018, the Provost and Vice President for Academic Affairs stated that she agreed with the investigator's conclusion that Ufeli's allegation that Hollenbaugh discriminated and retaliated against him based on race in the Summer 2018 course was unsubstantiated. (*Id.* at 124).

In November 2018, Ufeli received a letter from a TAMUCC I-CARE case manager. (D.E. 30-1 at 1). The letter and attached materials indicated that I-CARE was

---

[1] The three ungraded assignments accounted for 8 points out of a total of 736 points in the class.

a university program intended to support students who were struggling or distressed. (*Id.* at 1-3).

Later in November 2018, Ufeli e-mailed Elizabeth Reyes, an international student advisor at TAMUCC, indicating that he attached all the financial documents required for the issuance of an I-20. (D.E. 24-1 at 125). A week later, Reyes indicated that his I-20 was ready to pick up. (*Id.* at 133).

In late November 2018 and early December, Ufeli e-mailed Dr. Kristina Nelson regarding the grading of a group presentation that he believed to be unfair. (*Id.* at 169-70). Nelson responded that she would need to speak to the entire group and requested that they tell her what everyone contributed to the group. (*Id.* at 170-71). Later in December, Ufeli e-mailed Nelson again regarding what he believed to be unfair grading of several of his assignments. (*Id.* at 160-61). Nelson responded, stating that the assignments had been re-graded and that she had left feedback on them, but that she would be happy to meet with Ufeli to discuss them. (*Id.* at 162-63).

Also in December 2018, Ufeli e-mailed Reyes again and stated that one of the courses he was registered for at TAMUCC conflicted with a course he was taking at the Kingsville campus. (*Id.* at 141). He stated that he was going to drop the course since it was an elective, but that would leave him with only six credit hours because he could not register for any other courses in his program because they had prerequisites. (*Id.* at 142). Ufeli sought advice about what to do to maintain his F-1 status. (*Id.*). Reyes responded that Ufeli had to have at least nine credit hours for full-time status, which was required to maintain F-1 immigration status. (*Id.* at 143).

Ufeli then e-mailed Dr. Joshua Watson, a professor and the interim department chair, about what his options would be. (*Id.* at 146-47). Watson responded with three options, including: (1) an in-department elective course about counseling Spanish-speaking clients; (2) finding another course to take at the Kingsville campus; or (3) taking another graduate-level course in the psychology program that could serve as an elective. (*Id.* at 148-49). Following a meeting with Watson, Ufeli again e-mailed regarding what class to take. (*Id.* at 153-54). Watson again responded with a detailed e-mail laying out Ufeli's options and his remaining degree requirements, ultimately reiterating the options from his previous e-mail. (*Id.* at 155-58).

In January 2019, Ufeli e-mailed Rosie Ruiz, the Associate Director of TAMUCC's Employee Development and Compliance Services Office ("Compliance Office"), regarding re-opening his racial discrimination claim from the summer 2018 semester. (*Id.* at 174-75). Ruiz responded that the decision was final and that there was no appeal for Ufeli, but that he could file a retaliation complaint about Nelson's fall 2018 course if he wanted to. (*Id.* at 175-76).

On January 31, 2019, the Compliance Office sent Ufeli a confirmation that they were investigating his complaint that Nelson discriminated against him based on race and retaliated against him due to his previous discrimination complaint by: (1) failing to grade two major assignments and giving him an overall grade of C; and (2) assigning unfairly low grades to the two assignments when Ufeli brought them to her attention and still assigning an overall grade of C. (*Id.* at 182).

In February 2019, Reyes e-mailed Ufeli regarding his enrollment status because he was not registered for the required minimum of nine credit hours. (*Id.* at 183-84). Reyes warned Ufeli that his record would be terminated from the federal government's Student and Exchange Visitor Information System ("SEVIS") if he did not register as a full-time student. (*Id.* at 184). Ufeli told her to contact Wanese Butler, an employee at the Compliance Office, regarding the issue. (*Id.* at 186). Reyes contacted Butler, who stated that her office was not involved in enrollment issues. (*Id.* at 190). On March 1, 2019, Reyes sent Ufeli another e-mail stating that he still was not enrolled as a full-time student and that he would automatically be terminated in SEVIS on March 15, 2019, if he did not enroll in nine credit hours. (*Id.* at 198-99). Ufeli again directed her to the Compliance Office. (*Id.* at 201).

On April 1, 2019, the Provost and Vice President for Academic Affairs stated that she agreed with the investigator's conclusion that Ufeli's allegation that Nelson discriminated and retaliated against him in the Fall 2018 course was unsubstantiated. (*Id.* at 202).

### III. DISCUSSION

#### a. Motion to Dismiss Standards

Rule 12(b)(1) provides for dismissal due to a lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). Where a Rule 12(b)(1) motion is filed at the same time

9

as other Rule 12 motions, the court should consider the jurisdictional issue before addressing the merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The burden of proof for a Rule 12(b)(1) motion is on the party asserting jurisdiction. *Id.* Dismissal under Rule 12(b)(1) is appropriate if a claim is barred by Eleventh Amendment sovereign immunity. *See Warnock v. Pecos Cty., Tex.*, 88 F.3d 341, 343 (5th Cir. 1996).

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In determining whether to grant a motion to dismiss, the court must not go outside the pleadings and must accept all well-pleaded facts as true, looking at them in the light most favorable to the plaintiff. *Scanlan v. Texas A&M University*, 343 F.3d 533, 536 (5th Cir. 2003).

A pleading must include a short and plain statement of the claim showing that the pleader is entitled to relief and giving the defendant fair notice of what the claim is. Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, but the plaintiff must nonetheless provide more than merely labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The factual allegations in the complaint are assumed to be true, even if unlikely, but the allegations must "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Id.* at 555, 570. A claim has facial plausibility where the factual allegations allow the court to reasonably infer that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facts that are merely consistent with a defendant's liability are insufficient. *Id.*

10

In assessing a Rule 12(b)(6) motion to dismiss, the court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

### b.   Eleventh Amendment Immunity and § 1983 Claims

In the motion to dismiss, Defendants argue that, as state agencies, they are entitled to Eleventh Amendment immunity against monetary damages. (D.E. 27 at 7). They argue that even had Ufeli sued a state official under § 1983, that claim would still be barred under the Eleventh Amendment because a state official acting in his official capacity is not a "person" for the purposes of § 1983. (*Id.* at 8-9). On the merits, Defendants argue that Ufeli cannot proceed on his § 1983 claims because he has only named TAMUS and TAMUCC as defendants and there is no respondeat superior liability under § 1983. (*Id.* at 9). Finally, Defendants acknowledge that claims against a state official for injunctive or declaratory relief are permissible under *Ex Parte Young*, 209 U.S. 123 (1908), but argue that Ufeli has not identified any state official and has not alleged an ongoing violation of federal law. (*Id.* at 11).

Ufeli responds that Defendants' Eleventh Amendment argument is irrelevant because he does not seek damages under § 1983, but rather declaratory and injunctive relief. (D.E. 30 at 3). Ufeli argues that his claims are for prospective relief against ongoing violations of federal law, namely, Defendants' continued denial of admission into their academic programs and denial of accommodations. (*Id.* at 4-5). Further, he argues that he has identified several individuals who violated his rights. (*Id.* at 5).

The Eleventh Amendment gives a state immunity from suit in federal court by citizens of other states and its own citizens. *Union Pac. R.R Co. v. La. Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011). This immunity applies regardless of whether a suit seeks damages or injunctive relief. *Aguilar v. Tex. Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). A state may waive this immunity, but the waiver must include a "clear declaration" that the state intends to submit to federal jurisdiction. *Union Pac.*, 662 F.3d at 340. Moreover, Congress may abrogate Eleventh Amendment immunity as a means of enforcing the Fourteenth Amendment. *Id.* Under § 1983, a person may assert a claim against anyone who, under the color of state law, violates that person's rights under the Constitution. *Anderson v. Valdez*, 845 F.3d 580, 599 (5th Cir. 2016). Section 1983 does not abrogate a state's Eleventh Amendment immunity. *Aguilar*, 160 F.3d at 1054 (stating that the Eleventh Amendment bars claims against a state under § 1983).

The Fifth Circuit has held that Texas A&M is entitled to Eleventh Amendment immunity due to its connection to the state. *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1333 (5th Cir. 1984); *see also U.S. Oil Recovery Site Potentially Responsible Parties Grp. v. R.R Comm'n of Tex.*, 898 F.3d 497, 501-02 (5th Cir. 2018) (reaffirming that Texas A&M is an arm of the state entitled to Eleventh Amendment immunity). TAMUCC is a part of the Texas A&M system. Tex. Educ. Code § 87.401.

The Supreme Court has created a limited exception to Eleventh Amendment immunity wherein a plaintiff may bring suit for injunctive or declaratory relief alleging a violation of federal law against a state official in their official capacity. *Raj v. Louisiana*

*State University*, 714 F.3d 322, 328 (5th Cir. 2013) (citing *Ex Parte Young*, 209 U.S. 123, 155-56 (1908)). However, this exception applies only to suits against state officials, not in a suit against the state or its agencies. *Lewis v. University of Texas Branch at Galveston*, 665 F.3d 625, 630 (5th Cir. 2011).

Here, Ufeli's claims under § 1983 are barred by Eleventh Amendment immunity. Ufeli is correct that he does not seek damages against the state, but the Eleventh Amendment bars all suits against the state, including a suit for injunctive relief. (*See* D.E. 24 at 13); *Aguilar*, 160 F.3d at 1054. Further, in order to fall within the limited exception in *Young* that allows for injunctive relief, Ufeli must sue a specific state official in his or her official capacity. *Raj*, 714 F.3d at 328. Although Ufeli's complaint and attachments name several officials who allegedly violated his rights, he has not sued any of them. (*See* D.E. 24 at 1-2). Rather than suing any state official in their official capacity, he has sued only TAMUS and TAMUCC, which are instrumentalities of the state that are immune under the Eleventh Amendment. *See U.S. Oil Recovery Site*, 898 F.3d at 501-02; *Raj*, 714 F.3d at 328 (noting that the plaintiff's claims did not fall within *Young* because he sued only Louisiana State University rather than any individual state officials); *Aguilar*, 160 F.3d at 1054 (holding that a prisoner's suit against only the Texas Department of Criminal Justice was barred by the Eleventh Amendment). Ufeli has not argued that Defendants have consented to suit, nor does § 1983 waive their sovereign immunity. *See id.*

The undersigned draws no conclusion on whether these claims could properly be brought against any of the officials in their official capacity, but merely concludes that, as

13

currently constituted, the claims are against an instrumentality of the state and are barred by Eleventh Amendment immunity.

### c. Rehabilitation Act and ADA Claims

As to Ufeli's Section 504 and ADA claims, Defendants argue that he has failed to allege a qualifying disability under either statute because the complaint only vaguely identifies depression, despondency, and emotional incapacity. (D.E. 27 at 11-12, 14-15). Defendants assert that these symptoms do not form a separate claim because, as alleged by Ufeli, they were caused by the purported racial and ethnic discrimination. (*Id.* at 12). Regardless, Defendants argue that none of the identified problems qualify as disabilities because Ufeli has not alleged that they substantially limit a major life activity. (*Id.*). Finally, Defendants argue that the Section 504 claim fails because Ufeli has not alleged that he was discriminated against solely on the basis of his disability, and the ADA claim fails because Ufeli received adequate process for an academic dismissal and does not allege how the academic dismissal policy was used in a discriminatory manner. (*Id.* at 13, 15-16).

Ufeli responds that the complaints he filed with TAMUCC were based on both race and disability discrimination and that his disabilities, as alleged in the complaint, are qualifying disabilities. (D.E. 30 at 6-7). Finally, Ufeli asserts that he did inform Defendants of his disabilities and that his academic problems were caused by the discrimination. (*Id.* at 8-9).

To establish a claim under either Section 504 or the ADA in the context of a student excluded from an educational institution, a plaintiff must show that he: (1) has a

14

qualifying disability; (2) is otherwise qualified to participate in the educational program; and (3) was excluded on the basis of his disability. *Shaikh v. Texas A&M Univ. College of Medicine*, 739 F. App'x 215, 219, 224 (5th Cir. 2018). The application of the third prong differs between the two statutes. Under Section 504, the plaintiff must allege that he was discriminated against solely on the basis of his disability. 29 U.S.C. § 794(a). In contrast, Title II of the ADA has a lower standard, and the student's disability need only be a motivating factor in the exclusion. *Pinkerton v. Spellings*, 529 F.3d 513, 516-19 (5th Cir. 2008).

Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities," a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(1). "Major life activities" include caring for oneself, learning, reading, concentrating, thinking, communicating, and working, among other activities. *Id.* § 12102(2)(A). The definition of "disability" is to be construed broadly, and an impairment need only limit one major life activity to be considered a disability. *Id.* § 12102(4)(A), (C). Section 504 adopts the ADA's definition of "individual with a disability." 29 U.S.C. §§ 705(9)(B), (20)(B), and 794(a).

By accepting federal financial assistance, Defendants waived Eleventh Amendment immunity for discrimination suits under Section 504. *Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 345 (5th Cir. 2005). However, Title II of the ADA applies to all public entities, regardless of whether they receive federal funds, implicating Congress's power to abrogate sovereign immunity. *Pace v. Bogalusa City Sch. Bd.*, 403

F.3d 272, 276 n.4 (5th Cir. 2005). Congress may abrogate Texas's sovereign immunity if it exercises its power under the Fourteenth Amendment. *Shaikh*, 739 F. App'x at 224. This requires a three-step inquiry, including: (1) whether the state's conduct violated Title II of the ADA; (2) whether the state's conduct also violated the Fourteenth Amendment; and (3) if the state's conduct violated the ADA but not the Fourteenth Amendment, whether Congress's abrogation of sovereign immunity was nevertheless valid. *United States v. Georgia*, 546 U.S. 151, 159 (2006).

Here, Ufeli has failed to state a claim upon which relief can be granted on his Section 504 and ADA claims because, as to both, he has failed to allege a qualifying disability. Ufeli's complaint and attached evidence indicate only that he was "depressed, despondent, and emotionally incapacitated." (D.E. 24 at 9). However, even assuming that these conclusory conditions could qualify as a disability under certain circumstances, Ufeli does not allege how any major life activities were limited, much less "substantially" limited. 42 U.S.C. § 12102(1). He states that he received an "F" in a course that he could not complete, but this is a result, not a limitation in itself. (D.E. 24 at 6, 9-10). Ufeli does not allege what limitations to any major life activity caused him to be unable to finish the course, nor can any such limitations be inferred from the allegations because he does not expand on his conditions at all beyond the conclusory statement that he was "depressed, despondent, and emotionally incapacitated." (D.E. 24 at 9-10). Accordingly, because Ufeli's allegations do not allow the court to infer that he had a disability that substantially limited a major life activity, he has not alleged a claim under Section 504 or the ADA upon which relief can be granted. Because he has not alleged a claim under

Title II of the ADA, Defendants are entitled to Eleventh Amendment immunity on that claim. *See Georgia*, 546 U.S. at 159.

### d.  Retaliation

Finally, Defendants contend that Ufeli has not alleged a viable retaliation claim because he makes only a conclusory assertion that his disabilities were the reason for his expulsion, but does not allege that he was registered as a student with a disability or made any efforts to be recognized as such. (*Id.* at 16-17).

Ufeli did not address the retaliation claim in his response. Regardless, Ufeli did not raise a retaliation claim in his complaint because he never referenced retaliation and did not include such a claim in his causes of action. (*See generally* D.E. 24).

## IV.  CONCLUSION

Accordingly, it is recommended that Defendants' motion to dismiss (D.E. 27) be GRANTED and Ufeli's first amended complaint (D.E. 24) be DISMISSED.

Respectfully submitted this 12th day of December, 2019.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).